IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal No. **3:10-CR-235-L** |
| | § | |
| **ROBERT WALI** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Robert Wali's Motion to Suppress Evidence, filed December 6, 2010. After carefully considering the motion, response, record, and applicable law, the court **grants** Defendant Robert Wali's Motion to Suppress Evidence.

**I.     Background**

On the evening of March 30, 2010, the Grand Prairie Police Department received a phone complaint from a 911-caller about a person carrying a handgun. Police dispatch immediately relayed the message to patrol officers at approximately 6:28 p.m. The caller described the person as a black male wearing a red hat, black shirt, and black shorts, walking westbound on Stonehenge Drive near Crestbrook Lane, a residential area of Grand Prairie, Texas. The caller further estimated that the person was approximately seventeen years old, 5'6", and 180 lbs. The caller identified himself as "David" and provided his phone number to the dispatcher. Officer Brandon Poor ("Officer Poor") arrived on scene to investigate the complaint at approximately 6:31 p.m.

When Officer Poor arrived, he did not immediately see anyone fitting the description given by the caller; he soon elected to drive his vehicle slowly down a nearby alleyway located between Stonehenge Drive and Warrior Trail. After traveling a short distance, he observed Defendant Robert Wali ("Wali") walking in the alleyway. Wali fit the description of a black male wearing a black and

red hat, black shirt, and black shorts. Officer Poor quickly turned his vehicle siren and emergency lights on and stopped his vehicle behind Wali. Officer Poor then stepped out of the car with his gun unholstered and ordered Wali onto the ground. After Wali complied, Officer Poor secured Wali's hands with his own and, soon after, another police officer arrived on the scene for support. The second officer approached Wali, and together the officers performed a safety frisk for weapons. A .357 revolver in Wali's front waistband was discovered and seized. Officer Poor then attempted to handcuff Wali, but a short struggle ensued and Wali attempted to run. Ultimately, the officers were able to secure Wali, and he was arrested. Wali was indicted on August 17, 2010, for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). It was discovered that he had prior felony convictions for robbery, aggravated assault, and burglary.

Wali now moves to suppress the firearm and any other evidence obtained or statements he made while in police custody. He contends that he was subject to an illegal seizure in violation of the Fourth Amendment to the United States Constitution because Officer Poor had no reasonable suspicion to order Wali onto the ground and frisk him for weapons. Wali argues that the 911-caller reported nothing to establish criminal conduct because carrying a firearm is not necessarily illegal. Further, Wali contends that the caller's complaint was the functional equivalent of an anonymous tip and that there was insufficient indicia of reliability for Officer Poor to act upon the tip in the manner that he did. In this regard, Wali argues that the 911-caller gave the dispatcher a description that did not match. Whereas the 911-caller reported that the person was wearing a "red" hat, was seventeen years old, and 5'6", Wali states that he was actually wearing a "black" hat, was twenty-six years old, and 6'0".

## II. Legal Standard

Warrantless searches and seizures, often called "investigatory stops," are permissible "only if based on reasonable suspicion that 'criminal activity is afoot.'" *United States v. Martinez*, 486 F.3d 855, 859 (5th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "An officer's mere hunch or unparticularized suspicion is not sufficient; rather, a minimal level of objective justification for the stop must be present." *United States v. Jaquez*, 421 F.3d 338, 340-41 (5th Cir. 2005) (internal quotations and citations omitted). The burden is on the government to show "the reasonableness of a warrantless search or seizure." *Id.* at 341.

Insofar as relying on an informant's tip to investigate a suspect for criminal activity, such tips, "like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972). "Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Id.* When a tip is provided anonymously, "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). "Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* (citation omitted). "[A]n anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.* at 274.

**III. Analysis**

The court held an evidentiary hearing on January 5, 2011, and has since carefully reviewed the evidence and the testimony. Wali makes three arguments in support of his motion to suppress. First, he contends that the stop was unconstitutional because the 911-caller's report of a suspect carrying a gun does not establish criminal activity. Second, he contends that the information available to the arresting officers lacked sufficient indicia of reliability to effect a detention. Third, he contends that the officers lacked reasonable suspicion to believe that Wali fit the description of the suspect given by the 911-caller. The court addresses these issues separately.

**A. Whether Merely Carrying a Handgun Constitutes Criminal Activity**

It is undisputed that the 911-caller stated that there was a man walking down a residential street, carrying a handgun; that Grand Prairie police officers responded to this complaint and apprehended Wali in the general vicinity described by the 911-caller; and that Wali was carrying a handgun. The government argues that there is a general prohibition under the Texas Penal Code that carrying a handgun is illegal. *See* Gov't's Resp. 3 (citing Tex. Penal Code § 46.02). Accordingly, the government argues that it is illegal for an individual to carry a handgun on his person in most instances, and that such a general prohibition therefore warranted an investigatory stop by police. Wali notes a few exceptions to this general prohibition. Specifically, the Texas Penal Code allows an individual to carry a handgun when: (1) the person is on his property or on property under his control; (2) the person is walking directly to his car or a car under his control; or (3) the person has a license to carry a concealed weapon. Tex. Penal Code §§ 46.02; 46.15(b)(2) (Vernon 2003).

While it is undisputed that Wali did not possess a license to carry a concealed weapon, he argues that the police officers had no way of knowing that when they forcefully detained him. Further, Wali argues that the police officers made no attempt to verify whether he was on property under his control or on his way to a vehicle under his control at the time of detention. Officer Poor, while testifying at the evidentiary hearing, stated that he did not know whether Wali met one of these exceptions when he effected the stop.[1] Officer Poor additionally testified that further inquiry would have been necessary for him to make that determination.

Before delving into its analysis, the court believes that it must first draw a distinction between reported activity that is *per se* illegal and reported activity that is potentially illegal. Reported activity that is *per se* illegal contemplates reported conduct that is, by itself, absolutely against the law, such as the possession of narcotics. *See United States v. Roch*, 5 F.3d 894, 899 (5th Cir. 1993). Reported activity that is potentially illegal contemplates reported conduct that is against the law only if one or more additional elements are also present. *See id.* In the latter instance, when there is no indication that those other necessary elements are present, there cannot be reasonable suspicion of criminal activity arising out of the potentially illegal conduct. *See id.* Accordingly, the 911-caller's complaint described activity that was potentially illegal instead of *per se* illegal. The court therefore determines that the 911-caller's complaint, without more than just the bare bones assertion that the person was carrying a handgun, did not constitute a report of criminal activity. *See id.* Unless the tip was accompanied by sufficient indicia of reliability, further investigation was required before a forcible stop of the suspect could be authorized. *Adams*, 407 U.S. at 147.

---

[1] Officer Poor did testify that, at some point after he first ordered Wali to get on the ground, he recognized Wali from a previous encounter and knew that he did not live there.

**Memorandum Opinion and Order – Page 5**

### B. Whether Sufficient Indicia of Reliability Existed

Before it proceeds with further analysis, the court notes that the actions taken by Officer Poor upon encountering Wali escalated immediately beyond what can rightly be categorized as an "investigative stop." *See Roch*, 5 F.3d at 897. The video evidence establishes that Officer Poor first observed Wali walking eastbound in the alleyway, holding a white water bottle. The sun was out, and the surroundings were clearly lighted with high visibility. Officer Poor proceeded down the alleyway from the west with his emergency lights and siren on, and he pulled his vehicle up behind Wali. Wali moved to the side of the street when he saw the police car approaching. When Officer Poor stopped and exited his vehicle, he asked no questions, and Wali took no actions that could reasonably have been interpreted as a threat. The first words spoken by Officer Poor, who had his gun drawn, but down by his side rather than pointed at Wali, was a command for Wali to "get down on the ground!" At this point, Wali had been "seized" within the meaning of the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person.") (citation omitted). In light of Officer Poor's turning on his siren and emergency flashing lights, pulling out his gun, and ordering Wali to the ground, no reasonable person in Wali's position would have believed that he was free to ignore Officer Poor's commands or that he was free to leave. It is clear that Wali's liberty had been restrained and that he had been "seized" without investigation of any kind. *See Roch*, 5 F.3d at 897. After issuing two more commands for Wali to get on the ground (and after which Wali complied), Officer Poor approached Wali and, without further inquiry, secured Wali's hands with his own. A second police officer then arrived onto the scene and Wali was searched. A .357 revolver was found underneath Wali's shirt in his front waistband, and he was ultimately arrested.

The critical issue in this case, as was the issue in *Roch*, is whether Officer Poor had reasonable suspicion to seize Wali for illegally possessing a firearm. *See id.* "Even an investigatory stop would be proper only if based on reasonable suspicion that 'criminal activity is afoot.'" *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "If an officer observes suspicious activity, the Fourth Amendment requirement is satisfied if there is a 'minimal level of objective justification for the officer's actions, measured in the light of the totality of the circumstances.'" *Id.* (citing *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc)).

Here, Officer Poor did not observe anything other than a young black male, whose clothes closely fit a description provided by a 911-caller, holding a white water bottle, and walking down an alleyway. Officer Poor did not observe a criminal offense being committed or any questionable behavior before he seized Wali. The reasonable suspicion required for effecting a seizure, however, does not always require personal observation. It can be based on information provided by a tipster if the information possesses "an indicia of reliability." *Id.* (citations omitted).

Relevant factors to consider with respect to whether an indicia of reliability is present include:

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.

*Martinez*, 486 F.3d at 861 (quoting *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999). The dispatcher log shows that the 911-caller identified himself as "David" and that he left a phone number. No further information was provided, and none of the evidence suggests or even intimates that Officer Poor or the Grand Prairie Police Department had prior dealings with the 911-caller, or

had any special insight into his truthful reputation. Officer Poor further testified that, when he made the stop, he did not know the 911-caller had provided a name and phone number to the dispatcher.[2] Moreover, there was no verifiable predictive information about the suspect's future behavior that would have indicated any "inside knowledge" known to the tipster. *See id.* at 863. Functionally then, at the time of the stop, the information known to Officer Poor was the equivalent of an anonymous tip. *See id.* at 862. "To characterize it as anything else would be to assume the very credibility and reliability that the government has the burden of proving." *Id.*

Even if this is not an anonymous tip in the traditional sense, it raises serious concerns regarding the Fourth Amendment because there was simply nothing that Officer Poor knew to determine the reliability of the tip in its assertion of illegality. That the tipster left the name of "David" and provided a telephone number does not make it the same as a known informant providing information. It is not uncommon for persons who call in to report alleged criminal activity to provide only a first name, a false name, or a false telephone number. Moreover, this court knows from experience in issuing wire intercept orders that persons use prepaid telephones, and service providers do not require identification, or persons provide false information, when prepaid telephones are purchased. In such instances, there is no way to identify or locate the purchaser of a prepaid telephone if he elects to give false identifying information. Allowing a police officer to conduct a *Terry* stop before establishing the reliability of a tip in its assertion of illegality invites violations of the Fourth Amendment. Given the intrusive and embarrassing nature of a police seizure, the court does not believe that requiring law enforcement officers to have at least a modicum

---

[2]The court understands that this information would have been available to Officer Poor on his in-vehicle computer screen; however, Officer Poor testified that he did not view this information before he detained Wali and made no attempt to verify it. Therefore, that the information was available is quite beside the point, and it cannot be used to retroactively establish reasonable suspicion.

**Memorandum Opinion and Order – Page 8**

of knowledge regarding a tip's assertion of illegality places an undue burden on their ability to conduct law enforcement activities.

The court therefore concludes that the reliability of the informant in this case could not be established by the tip alone. "[A]n anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Florida v. J.L.*, 529 U.S. at 274. For the seizure to be justified within the context of the Fourth Amendment, reasonable suspicion must have been based on some or all of the other listed factors, including the specificity of the information provided, the extent to which the information is corroborated by officers in the field, and whether that information concerns recent activity or has instead gone stale. *Martinez*, 486 F.3d at 862. The court discusses these factors in the following section.

### C. Whether Reasonable Suspicion Justified the Seizure

Before continuing further, the court clarifies the foregoing points of law concerning reasonable suspicion and criminal activity. The seminal Supreme Court case that controls the court's Fourth Amendment analysis is *Terry v. Ohio*. That case holds that an investigatory stop is permissible when the police officer has reasonable suspicion that "criminal activity *may be* afoot." *Terry*, 392 U.S. at 30 (emphasis added). Fifth Circuit authority, including *Roch* and *Martinez*, however, holds that an investigatory stop is permissible only when the police officer has reasonable suspicion that "criminal activity *is* afoot." *Martinez* 486 F.3d at 859; *Roch*, 5 F.3d at 897 (emphasis added). Although the chosen language in *Terry* contrasts with the chosen language in *Roch* and *Martinez*, the outcome is the same for the purposes of the court's analysis. As discussed above, reasonable suspicion as to a criminal activity can exist only when the police officer has an

independent basis of belief, rising above the level of a "mere hunch or unparticularized suspicion," that all elements necessary for a criminal act are present. *See Jaquez*, 421 F.3d at 340-41.

Without some form of independent basis of belief—arising out of either a reported tip, a police officer's visual observation, or another source—to establish that all necessary elements to a criminal activity are present, there can be no reasonable suspicion justifying a warrantless search or seizure. Without such a basis, there is simply no reasonable suspicion that criminal activity may be afoot, and there is certainly no reasonable suspicion that criminal activity *is* afoot. Even if there is a practical distinction between the two standards, the court reaches the same result because the evidence provided by the government is too tenuous, without further inquiry, to show that criminal activity "was" afoot or "may have been" afoot. Nothing was done by Officer Poor prior to the stop to show that the tip was reliable in its assertion of illegality, even though information regarding the tipster was available had Officer Poor checked.

In this case, the 911-caller provided information as to the physical description of the suspect, including his race, clothing, and approximations of age, height, and weight. The tip also clearly concerned recent activity; it was approximately five minutes between the time the call came in and Officer Poor arrived on scene. To the extent that the provided information could be corroborated, Officer Poor testified that he observed Wali in the vicinity described by the 911-caller and that Wali fit the description given as to the suspect's race and clothing. Officer Poor stated that he was unable to determine whether the 911-caller's approximations of age, height, and weight were accurate.

Accordingly, the only *verified* information that Officer Poor had at the time he effected the seizure concerned the suspect's race, clothing, and physical proximity to Stonehenge Drive. Notably absent, however, was any verified information that "criminal activity [was] afoot." *Martinez*, 486

F.3d at 862. (citing *Jaquez*, 421 F.3d at 340-41). Officer Poor did not see a gun because Wali was not displaying one. There was no evidence that Wali was even carrying a gun until after he had been seized and searched for weapons. Even if Officer Poor suspected that Wali was carrying a handgun, there was no indication that Wali was illegally in possession of it. "An officer's mere hunch or unparticularized suspicion is not sufficient; rather, a minimal level of objective justification for the stop must be present." *Jaquez*, 421 F.3d at 340-41. Prior to the stop, there was nothing about Wali to indicate that he was a felon or that he did not fall within one of the enumerated exceptions to the general prohibition against carrying a handgun under the Texas Penal Code. Officer Poor even testified that, to make such a determination, further inquiry would have been necessary, inquiry that did not transpire until *after* Wali had been arrested; however, after-acquired evidence or information cannot be used to establish reasonable suspicion for the initial stop.

The court views this case as a classic example of "putting the cart before the horse." In this instance, Officer Poor quite literally jumped the gun. While a police officer's right to effect a *Terry* stop necessarily authorizes the use of reasonable force to secure a suspect, such a stop must be predicated on reasonable suspicion of criminal activity. *See United States v. Campbell*, 178 F.3d 345, 348-49 (5th Cir. 1999). Officer Poor testified that his chosen approach in having his gun at the ready was necessary due to his concern that Wali would flee. In several reviews of the video evidence, however, the court saw nothing to indicate that Wali was an immediate flight risk or that Wali posed an observable threat to anyone. Wali, however, did appear to be somewhat startled by Officer Poor's approach, but that cannot reasonably be interpreted that Wali would flee. As there was no reasonable suspicion to detain Wali, no authority existed to effect a *Terry* stop, and consequently the use of force or threat to use force was not justified. While approaching the suspect

with a drawn gun would be understandable and justified if the circumstances were such that a real and immediate threat existed to the officer's safety or to others, such was not the case here. The sun was still shining, and the alleyway was well lighted. Wali was walking by himself and was holding only a white water bottle in his hand. He made no furtive move or any attempt to retrieve a concealed weapon. He did not put his hands inside his clothing or otherwise conceal his hands from the police officer. Under these facts, Officer Poor could not have reasonably believed that he or others were in immediate danger when he pulled his vehicle up behind Wali.

While the court understands and appreciates that police officers risk their lives every day on the job, police response must nevertheless be balanced against the constitutional protections of the Fourth Amendment. The court also recognizes and appreciates the ever present concern for officer safety and states without hesitation that there are situations that absolutely justify the kind of approach that Officer Poor took when he apprehended Wali.[3] Such a situation, however, was not present in this case.

### D. Police Conduct Inconsistent with *J.L.* and *Roch*

The court is convinced that the police conduct resulting in the seizure of Wali in this case is at odds with the teachings of *J.L.* and *Roch*. The facts of this case are nearly identical to the facts of *J.L.*, and the court sees no appreciable distinction between these facts and those of *Roch* with respect to the seizure.

In *Florida v. J.L.*, the Supreme Court held that a juvenile's Fourth Amendment right to be free from an unlawful search and seizure was violated when the arresting officers acted solely on

---

[3]For example, if Officer Poor had observed Wali actually holding a gun or what appeared to be a weapon, instead of a white water bottle, concern for his own safety would have justified his chosen approach. Likewise, if Wali had made a sudden move as if he were reaching for a weapon, Officer Poor's approach would have been justified.

**Memorandum Opinion and Order – Page 12**

an anonymous tip. The suspect juvenile was described as "a young black male standing at a particular bus stop and wearing a plaid shirt," and he was reported to be carrying a gun. The officers approached the location and saw three young black males, one of whom matched the description of the suspect. The officers did not see a firearm, and the suspect juvenile made no threatening or otherwise unusual movements. One of the officers nevertheless approached the juvenile, ordered him to put his hands on the bus stop, frisked him, and seized a gun from his pocket. The juvenile was subsequently arrested. *Florida v. J.L.*, 529 U.S. at 268.

In this case, like in *J.L.*, the 911-caller gave a description as to the suspect's age, race, clothing, and location. The only difference in this case is that the caller left a name and phone number, whereas in *J.L.* no such information was provided. This distinction is of no moment, however, because none of the identifying information regarding the caller was known to Officer Poor at the time he effected the seizure on Wali. As the court determined above, the caller's complaint in this case was the functional equivalent of an anonymous tip. Accordingly, the outcome of this case necessarily aligns with the outcome in *J.L.*

In *United States v. Roch*, the Fifth Circuit Court of Appeals held that a tip from a *known informant*, who had provided reliable information in the past, did not give police officers reasonable suspicion to effect an investigatory stop. The tipster told police that the suspect was in possession of firearms and described the suspect as a blonde, white male with body tattoos, and further stated that the suspect drove an orange and white pickup truck and was staying at a local motel room with his girlfriend. Police officers shortly thereafter set up surveillance on the local motel and eventually saw an orange and white pickup truck pull out of the parking lot with a male driver and female passenger. The truck soon pulled into a gas station, and law enforcement officers moved in

immediately. A Houston police officer "threw down" on the suspect and ordered him to get on the ground. The suspect was then handcuffed, and a federal agent observed the butt of a firearm sticking out of a bag in the truck. *Roch*, 5 F.3d at 896.

The police officers in *Roch* actually had more descriptive information to work with than Officer Poor did in this case, and that information came from a known informant who had provided reliable information to officers in the past, unlike the 911-caller in this case. In *Roch*, the informant gave the police officers a description of race and other identifying personal features including blonde hair and body tattoos. The informant further provided officers with a vehicle description, a location, and notification that the suspect would be accompanied by his girlfriend. The officers were able to verify the informant's reported information identifying the suspect from their surveillance of the local motel. The Fifth Circuit nevertheless held in *Roch* that all of this was insufficient to amount to "reasonable suspicion" and justify an investigatory stop, principally because the police officers did not observe any criminal activity from their surveillance. *See id.* at 897.

In this case, it is undisputed that Officer Poor observed no criminal activity, that the 911-caller had no previous interaction with Grand Prairie police where he provided them with reliable information, and that nothing about the 911-caller was known to Officer Poor. Here, the reliability of the informant was never verified or questioned prior to the stop,[4] and Officer Poor had even less identifying information about the suspect than the law enforcement officers in *Roch* did. If the information available to (and verified by) the officers in *Roch* did not amount to reasonable suspicion under the law, the court does not see how reasonable suspicion could possibly exist under

---

[4]The court has already determined that the 911-caller's complaint in this case was the functional equivalent of an anonymous tip.

**Memorandum Opinion and Order – Page 14**

the law with respect to the facts here. The outcome in this case must therefore comport with the outcome in *Roch*.

The court simply cannot square the detention of Wali in this case with the holdings of *J.L.* and *Roch*. Although the type of approach used by Officer Poor appears to occur with some frequency with respect to officers of the Grand Prairie Police Department,[5] such an approach is clearly contrary to Supreme Court and Fifth Circuit precedent. Allowing this conduct to stand would eviscerate the holdings of *J.L.* and *Roch* and render them bereft of any legal significance. *Roch* continues to enjoy vitality and widespread application in this circuit. *See, e.g.*, *United States v. Gomez*, 623 F.3d 265, 270 n.2 (5th Cir. 2010); *Martinez*, 486 F.3d 855, 859-64; *United States v. Hernandez*, 477 F.3d 210, 214 n.12 (5th Cir. 2007). The court has no basis to depart from clearly established law.

## IV. Conclusion

For the reasons stated herein, the court **concludes** that the government has failed to carry its burden in establishing that reasonable suspicion existed to seize Wali. The seizure violated the Fourth Amendment's prohibition on unreasonable searches and seizures. The court therefore **grants** Defendant Robert Wali's Motion to Suppress Evidence. Accordingly, the .357 revolver, recovered by the officers on March 30, 2010, and any other evidence seized or statements made by Wali while in police custody will be **excluded** at trial. During trial, the government will not be permitted to admit, produce, or refer to any evidence seized or statements made by Wali as a result of the March 30, 2010 seizure and arrest.

---

[5]Officer Poor testified that he took similar approaches to the one he took in this case on prior occasions in response to reports of persons carrying a firearm. The only reasonable inference is that this approach is reflective of the training he received to become a Grand Prairie police officer and that other officers are trained in the same manner.

**Memorandum Opinion and Order – Page 15**

**It is so ordered** this 3rd day of March, 2011.

／s/ Sam A. Lindsay
Sam A. Lindsay
United States District Judge